**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ENGINEERED ABRASIVES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 13 C 7342 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| AMERICAN MACHINE PRODUCTS & | ) | |
| SERVICE INC., EDWARD C. RICHERME, | ) | |
| and EDWARD RICHERME, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Engineered Abrasives, Inc. ("EA"), which designs, manufactures, and services automated shot peening and blast finishing equipment, filed suit against its former employees Defendants Edward Richerme and Edward C. Richerme,[1] and the company they now operate, Defendant American Machine Products & Service Inc. ("AMPS"). Claiming that Defendants were misrepresenting themselves as EA representatives and unfairly competing with EA, EA brought six claims against Defendants: (1) trademark infringement under the Lanham Act, 15 U.S.C. § 1114; (2) false advertising under the Lanham Act, 15 U.S.C. § 1125; (3) copyright infringement in violation of 17 U.S.C. § 106; (4) state law unfair competition; (5) violation of the Uniform Deceptive Trade Practices Act ("UDTPA"), 815 Ill. Comp. Stat. 510/1 *et seq.*; and (6) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/1 *et seq.* After Defendants failed to answer the complaint, Judge Grady found Defendants to be in default. Docs. 12, 15. After extensive discovery on EA's damages, the case

---

[1] To distinguish between the two individual Defendants, who are father and son, the Court will refer to Edward Richerme as the "Father" and Edward C. Richerme as the "Son" throughout this Opinion and Order. They will collectively be referred to as the "Richermes."

was reassigned to this Court, and an evidentiary hearing was held on November 21, 2014 on EA's request for relief.

Based on the evidence presented at that hearing and the parties' other submissions, the Court awards EA $207,257 in monetary damages, $499,088.80 in attorneys' fees, and $668.24 in costs. The Court also permanently enjoins Defendants from using any presently held EA trademark or any confusingly similar mark or imitation and orders Defendants to deliver all EA materials in their possession to EA for destruction. Additionally, because the Court finds Defendants' conduct during discovery warrants sanctions, the Court grants EA's motion for sanctions [56] and orders Defendants to reimburse EA for the cost of conducting the forensic computer examination.

## BACKGROUND

In business since 1968, EA designs and manufactures automated shot peening[2] and blast finishing equipment. It also provides replacement parts and supplies and installation, maintenance, and repair services to its customers. EA's parts are modified and manufactured specifically for its machines. Mike Wern, EA's president and owner, estimated that EA provides approximately 95% of all high-volume shot peening equipment for American automotive companies. The Father began working at EA in October 1982, rising to be plant superintendent. He was a highly valued, trusted, and compensated EA employee. The Son began working at EA in February 1992.

EA's polyurethane parts, including knobs, tooling machine cabinet liner sheets, machine tables, and tooling sleeves, are manufactured in a distinctive red color. EA has been using this

---

[2] According to EA's website, shot peening "is a cold work process used to finish metal parts to prevent fatigue and stress corrosion failures and prolong product life for the part." http://www.engineeredabrasives.com/what-is-shot-peening.html. Shot peening is a process similar to sandblasting, except the process uses steel particles instead of sand. Evidentiary Hearing Tr. 10:11–15.

color in its products since at least 1983. EA has trademarked the use of the color red in its polyurethane table cover, sheets, knob-like cylinders, and cylinders (the "Red Trademarked Goods"). These trademarks have a registration date of September 9, 2014. EA also holds registered trademarks in the name "Engineered Abrasives," the acronym "EA," and its logo. EA's website and job shop services brochure are copyrighted, having been registered on October 9, 2013, only two days before this lawsuit was filed. But the brochure is registered with a creation date of 2004 and a publication date of December 12, 2008, and the website with a creation and publication date of 2011.

In 2009, Wern and the Father incorporated a new business, ER Parts, with the intention of having ER Parts provide parts to EA's customers if EA went into bankruptcy. To that end, EA delivered parts to the Richermes' property in Mokena, Illinois in February 2009. The Father prepared an inventory of the parts, dated February 2, 2009, which listed the total retail value of the inventory as $685,602.96. EA then directed certain orders to ER Parts, which were filled from the inventory. Approximately $40,000 worth of product was sold between February and April 2009. After April 2009, EA directed all parts business back to itself. Eventually, ER Parts was dissolved. Although Wern told the Father to bring the remaining inventory back to EA, the Father only returned a few parts to EA and kept the retained inventory at his Mokena property.[3] Neither ER Parts nor the Richermes ever paid EA for the parts that remained with the Richermes. EA also never requested payment for any sales that ER Parts made.

Two years later, the Richermes left EA and started AMPS. On September 12, 2011, two banking accounts were opened in AMPS' name at Fifth Third Bank. In late September 2011, the Father told Wern that he was taking a leave of absence. Then, on October 15, 2011, the Son was

---

[3] What exactly was returned is unclear. Wern testified that he saw the Father return several magna valves and that the Father additionally told Wern that he was going to return some air valves and blast hoses. Wern testified that he did not check to see what was returned.

terminated from his job at EA. A few days later, on October 21, 2011, AMPS generated an invoice for repairs to a media valve at Borg Warner Automotive's Bellwood, Illinois facility. The Son had performed similar work at that facility as an EA employee only several months before. He testified that he obtained the work in October through a Borg Warner employee he contacted after being terminated from EA, who offered that the Son could service Borg Warner's equipment.

Defendants operated AMPS in direct competition to EA, representing that they could supply EA parts and service EA machines, often at less cost to the customer. Defendants used the ER Parts inventory at the Richermes' Mokena property as a starting point for their business, selling those products to EA customers while attempting to conceal that they were EA products by sanding off the EA name and part number from the product. Most of the ER Parts inventory has been sold, usually at a price less than that listed on the inventory sheet produced by the Father for ER Parts. The Son testified that he believed AMPS realized approximately $100,000 to $130,000 from selling the products remaining from the ER Parts inventory. He estimated that less than $20,000 of inventory remained, with some of those products obsolete. The Father testified that approximately $10,000 to $15,000 worth of products had not been sold. But in his bankruptcy filing, he valued those products at only $750, which, he explained at the evidentiary hearing, reflected a discount from the retail value.

To advertise their new business, the Richermes produced a brochure for AMPS, which was available on the AMPS website and listed various services and products AMPS could provide. That brochure specifically stated that AMPS "can supply parts and components that will fit many applications," listing several brands, including EA. Evidentiary Hearing Ex. 19 at EA 00030. Some of the parts depicted in the brochure were EA parts.

Defendants also sought to confuse customers by using product numbers similar to those used by EA. For example, an EA ¼" gunbody was identified as #10000C, but AMPS referred to the same gunbody as #10300C. This led IDG, a supplier to Borg-Warner Automotive, to request a quote from EA for the ¼" gunbody using the AMPS product number instead of the EA product number. *See* Evidentiary Hearing Ex. 48; Evidentiary Hearing Tr. 54:9–25.

But Defendants' actions did not always result in as innocent a mistake as having a purchase order reference the wrong product number. They also caused reputational problems for EA because of shoddy work performed by the Richermes. In one instance, for example, AMPS had installed a media valve at a Ford plant that malfunctioned. Because it was an EA part and machine, however, the customer called EA upset about the malfunction, requiring Wern and others to play damage control.

EA also had to address allegations made by the Son in a December 18, 2012 email he sent to numerous individuals at Ford, including its executive chairman and president and certain EA contacts there. In that email, the Son complained that Ford had not contacted AMPS about alleged defects in AMPS-supplied parts but instead complained to EA about them. The Son also claimed that EA violated Ford's ethics rules in its dealings with Ford employees. But this email was prompted by an email sent by Wern notifying Ford that EA was in litigation with Defendants and asking Ford to contact Wern if Defendants contacted anyone at Ford. Although Wern testified that he had to explain the Son's accusations, Wern admitted that EA did not suffer any repercussions from the Son's email.

In addition to having EA parts in their possession, the Richermes also left EA with a large amount of EA's proprietary information, including CAD drawings, proposals, and details about EA's parts system. Despite the fact that some of these documents are dated as late as

October 2011, the Father testified that he took many of these documents when ER Parts was established with Wern's permission. Defendants have used these documents in several ways, including sending schematics of EA parts to a Forecast Sales representative in October 2013 in an attempt to manufacture replacement parts to sell to customers.[4] EA's parts lists, which included information about EA's pricing, allowed Defendants to quote prices lower than EA to common customers. With this list, for example, AMPS provided Chrysler with a comparison of the current price Chrysler was paying for EA parts compared to the lower prices it would pay if it ordered the same (or allegedly comparable) parts from AMPS. *See* Evidentiary Hearing Exs. 35–36.

Defendants also used EA's documents in an effort to submit a quote to Chrysler for a shot peening machine through a third party. The Richermes provided Dan Dickey, the owner of Innovative Peening Systems ("IPS"), with EA documents and recommended a target range for the quote. Although the idea was to submit the quote through RB Tools, which had a vendor number with Chrysler, the Richermes expected to receive a commission if RB Tools and IPS obtained the business.

In response to Defendants' actions, EA instituted this case and a parallel case against AMPS, the Father, and the Son in state court. A preliminary injunction was entered in the state court case on October 11, 2012 against Defendants, providing:

> 1) The Defendants will not make purchases parts or products directly from Axxiom/Schmidt, and;
>
> 2) provide either a hardened metal seat or spacer or a shot peened spring in any valve supplied to any of their customers; and
>
> 3) use part numbers of Plaintiff.

---

[4] According to its website, Forecast Sales "develop[s] and manufacture[s] the extensive line of premium Pirate Brand® blasting equipment" and makes "aftermarket parts that are 100% compatible with most of the major manufacturers in the abrasive blast industry." http://www.forecastsalesinc.com.

4) All parties shall not disparage the other in any communications with third parties or discuss details of the case other than to confirm its existence.

Evidentiary Hearing Ex. 5.  On December 28, 2012, a second preliminary injunction was entered

in the state court case:

A preliminary injunction is entered restraining the defendants from contacting any client or customer of Engineered Abrasives in any manner, except that the defendants may complete an outstanding order to Global to sell belts and send collection notices for unpaid invoices.

Evidentiary Hearing Ex. 6.  On October 28, 2013, the state court entered an additional order

restraining Defendants' actions:

1) The Defendants, their agents or assigns shall <u>not</u>:

A) Sell, or offer for sale, any media valve or product containing a metal seat or spacer or such other seat or spacer that is hardened in any manner;

B) Sell, or offer for sale, any media valve from or produced by AXXIOM/Schmidt.

2) The Defendants shall remove from their website:

A) Any reference to Engineered Abrasives;

B) Any and all references to AXXIOM/Schmidt;

C) Any and all references to any hardened seat or spacer, metal or otherwise.

3) Defendants shall post on each page of their website the following disclaimer:

"Neither A.M.P.S., Ed Richerme nor Ed C. Richerme is affiliated with Engineered Abrasives, Inc.  Neither A.M.P.S., Ed Richerme nor Ed C. Richerme sells any type of hardened metal or hardened seat or spacer in any media valve."

Evidentiary Hearing Ex. 7.

Despite these orders entered in 2012, on July 17, 2013, the Son sent an email in which he stated that "[t]here is no court order of any type that regulates who or what we can sell to." Evidentiary Hearing Ex. 33 at ESI00168062. In an email on the same day, however, he acknowledged that he could not contact certain individuals at Chrysler "because of the ongoing lawsuit [he is] currently restricted what customers [he] can contact of EA's." Evidentiary Hearing Ex. 32 at ESI00180872. And even after the injunctions were entered, AMPS continued to do business with at least Dana Mexico, an EA customer. The Son testified that he made four trips to Dana Mexico's facility in 2013 and 2014, which generated over $50,000 in revenue. He testified that he did not think this was a violation of the injunction because Dana Mexico reached out to him.

Between September 2011 and March 2014, AMPS' accounts at Fifth Third Bank had total deposits of $516,878.94. Defendants submitted spreadsheets of AMPS' 2012 and 2013 expenses and deposits. In 2012, reported deposits were $169,166.66 and expenses were $161,074.99. Evidentiary Hearing Ex. 3. In 2013, reported deposits were $209,235.45 and expenses were $148,547.45. Ex. 4.

The two litigations have hampered Defendants, however. The Son testified that he has not been able to purchase products from Electronics, Incorporated and from Global Parts & Maintenance. Although AMPS began work for Borg Warner soon after it was established, Borg Warner is no longer an AMPS customer, with its relationship ending in late 2012. The Son also testified that his business decreased in 2014, though Defendants did not submit financials for that year in support.

But further evidencing the decline in Defendants' financial state, on August 5, 2014, the Father filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Northern

District of Illinois. On September 12, 2014, the bankruptcy court lifted the automatic stay to allow this Court to conduct an evidentiary hearing and enter final judgment, including appropriate monetary damages and injunctive relief, against the Father in this case. *See In re Edward Richerme*, No. 14-bk-28683, Doc. 33 (Bankr. N.D. Ill. Sept. 12, 2014).[5]

## ANALYSIS

With the entry of default against Defendants, *see* Docs. 12, 15, liability on each claim alleged in the Complaint has been established. *See e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 602 (7th Cir. 2007). This means that the Court must accept all well-pleaded facts in the Complaint concerning liability as true. *Domanus v. Lewicki*, 742 F.3d 290, 303 (7th Cir. 2014). But "while a default judgment conclusively establishes liability, the victor must still prove up damages." *Id.* The Court must determine whether the remedies requested are appropriate, *e360 Insight*, 500 F.3d at 604, and ensure that "the amount[s] sought . . . naturally flow from the injuries pleaded," *Domanus*, 742 F.3d at 303 (citations omitted) (internal quotation marks omitted). EA requests monetary damages, injunctive relief, attorneys' fees and costs, and sanctions for Defendants' alleged abuses of the discovery process. The Court will address EA's requested relief in turn.

## I.      Monetary Damages

EA seeks monetary damages on its Lanham Act and Copyright Act claims. These claims arise from the same general course of conduct, and so EA is only entitled to a single monetary award on these claims. *See Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 940–41 (7th Cir. 1988) (single verdict on damages was appropriate "since both the Lanham Act and the Copyright Act

---

[5] The bankruptcy court also lifted the stay to allow the state court to rule on EA's motions to enforce the state court orders and to adjudicate Defendants' alleged violations of the injunctions entered in that case. *In re Edward Richerme*, No. 14-bk-28683, Doc. 55 (Bankr. N.D. Ill. Dec. 5, 2014). But the bankruptcy court order specifically noted that to the extent that a monetary judgment was entered against the Father in the state court case, enforcement of that monetary judgment was not allowed. *Id.*

provide for the same measure of damages under like circumstances"); *Flava Works, Inc. v. Wyche*, No. 10 CV 0748, 2010 WL 2635784, at *1 (N.D. Ill. June 28, 2010) (plaintiff "may not be compensated twice for the same injury" under the Lanham Act and the Copyright Act); *Joseph J. Legat Architects, P.C. v. U.S. Dev. Corp.*, No. 84 C 8803, 1991 WL 38714, at *14 & n.8 (requiring plaintiff to choose relief under Lanham or Copyright Act "to eliminate any inconsistency that may result between the two counts and to prevent double recovery"). EA's requested relief acknowledges this fact, as it seeks only a single recovery of Defendants' gross revenue as set forth under the damages provisions of either the Lanham Act or the Copyright Act. *See* Doc. 77 at 30. Thus, although the Court considers the amount of damages possible under both statutes because the Lanham Act provides the potential for treble damages, it only grants EA one recovery on these claims—which, as set forth below, is the same under both statutes, eliminating the need to choose one recovery over the other.

### A.    Lanham Act Claims

EA brought two Lanham Act claims, one for trademark infringement of the Red Trademarked Goods in violation of 15 U.S.C. § 1114 and another for false advertising in violation of 15 U.S.C. § 1125(a). Although in its updated memorandum of relief, EA claims that the Complaint sought relief for the infringement of any EA trademark, *see* Doc. 77 at 6, EA's claim as pleaded is limited solely to the infringement of the Red Trademarked Goods and thus liability has been established only as to these products. Damages on this claim must similarly flow only from infringement of the Red Trademarked Goods. *See Domanus*, 742 F.3d at 303. EA's false advertising claim, however, is broader and encompasses any false and misleading representations Defendants made regarding AMPS' ability to provide EA products and services that led customers to believe EA and Defendants were associated in some way.

The Lanham Act provides the following monetary remedy:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . . In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

15 U.S.C. § 1117(a). Section 1117(b) further provides treble damages for trademark infringement where Defendants' violations are willful unless the Court finds that extenuating circumstances exist. EA requests an award of AMPS' profits, trebled for Defendants' alleged willful infringement. EA posits two alternative numbers for AMPS' sales. First, it contends that AMPS' gross revenue is represented by the total deposits made in its bank accounts between September 2011 and March 2014, stipulated by the parties to be $516,878.94. Alternatively, EA asks the Court to find that AMPS' profits are represented by the retail value of the ER parts inventory prepared by the Father in 2009, $685,602.96.

Before calculating profits, the Court must note that EA cannot recover monetary damages on its trademark infringement claim. 15 U.S.C. § 1111 provides that "in any suit for infringement" under the Lanham Act by a trademark registrant who has failed to give notice of trademark registration, "no profits and no damages shall be recovered under the provisions of

this chapter unless the defendant had actual notice of the registration."[6]  Although the

applications were filed March 7, 2013, EA only obtained trademark registration for its Red

Trademarked Goods on September 9, 2014.  *See* Doc. 97-1 at 4, 7, 10, 13.  Thus, EA cannot

recover monetary damages for infringement of its Red Trademarked Goods prior to that date.

*See Dwyer Instruments, Inc. v. Sensocon, Inc.*, 873 F. Supp. 2d 1015, 1028 (N.D. Ind. 2012)

("[T]he notice language of § 1111 only applies to registered marks and to claims for

infringement of such registered marks.  It would have been improper and incorrect for the

Plaintiff to notify the Defendants that the design of its lens was registered before the actual date

of registration.").  Because EA has not submitted any evidence of Defendants' profits after

March 2014, the Court will only consider the damages EA can recover for its false advertising

claim under § 1125(a), which does not require a registered mark.[7]  *Cf. id.* (finding plaintiff

"eligible to recover damages for any infringement under 15 U.S.C. § 1125(a) that occurred

before the lens mark was registered"); *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273,

306 (S.D.N.Y. 2002) (allowing plaintiff to recover damages for any infringement that occurred

---

[6] The Seventh Circuit has stated, however, that "[o]mission of the ® symbol and lack of knowledge combined do not foreclose equitable remedies (including the confiscation of the defendant's stocks of products)."  *United States v. Sung*, 51 F.3d 92, 94 (7th Cir. 1995).  Thus, injunctive relief is available to EA for its trademark infringement claim, as discussed below.

[7] Because damages are not being awarded on the trademark infringement claim, the Court need not consider EA's request for treble damages, as those are only available under § 1117(b) for a violation of § 1114.  While the Court could award EA up to three times the actual damages it suffered under § 1117(a), because EA does not request actual damages nor submit proof of actual damages, this provision of § 1117(a) is not at issue.  *See WMS Gaming, Inc. v. WPC Prods. Ltd.*, 542 F.3d 601, 606 (7th Cir. 2008) (warning against conflating the different standards that apply to claims for actual damages and accounting of profits under § 1117(a)); *Zinn v. Seruga*, No. 05-3572(GEB), 2009 WL 3128353, at *37 (D.N.J. Sept. 28, 2009) ("Damages are treated separately from profits, and regarding damages, a court may award the infringed up to three times the actual damages.").  EA's reply, read liberally, could be construed to include an argument that the ER Parts inventory represents actual damages, not Defendants' profits.  *See* Doc. 115 at 6–7. But because this argument was raised only in reply, it is waived, *Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010) ("[A]rguments raised for the first time in a reply brief are waived.").  Moreover, EA never requested actual damages in its Complaint and so cannot be awarded them now.  Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings.").

before the registration date under § 1125(a) because registration is not a prerequisite to recovery under that section).

As for this calculation, the retail value of the inventory, as assessed by the Father in 2009, is not representative of AMPS' sales because all parties acknowledge that some portion of that inventory was sold in 2009 on behalf of ER Parts, some parts were returned to EA in 2009, Defendants generally sold the parts at below the listed retail value, and some parts have still not been sold. Thus, even EA must acknowledge that the $685,602.96 figure overestimates AMPS' sales. As for the deposits in the AMPS bank account, the Son testified that he made initial deposits of his own money into that account, implying that this also overestimates AMPS' sales. But because the evidence presented to the Court suggests that this number more closely reflects AMPS' sales than the inventory retail value, and the Court has "broad latitude" in quantifying damages after a default is entered, *Domanus*, 742 F.3d at 303, the Court uses the deposits in the bank account as representative of Defendants' sales.

This does not end the calculation, however, for Defendants introduced two spreadsheets at the evidentiary hearing that list AMPS' expenses for 2012 and 2013. EA did not challenge these spreadsheets or their contents. Thus, the expenses listed there—totaling $309,621.94— must be deducted from Defendants' profits pursuant to § 1117(a). This results in an award of $207,257.00. The Court acknowledges that this award may result in a windfall to EA because some of the profits may not be attributable to conduct that violates the Lanham Act's false advertising provision, but Defendants did not provide any additional support to allow for further deductions. *See WMS Gaming*, 542 F.3d at 607–08 (burden is the wrongdoer's to show that portion of revenues not obtained from infringement).

### B. Copyright Act Claim

EA also seeks monetary damages under the Copyright Act. EA's website and job shop services brochure are copyrighted, and EA alleged that Defendants duplicated and distributed text from those documents. Although EA has not specified what exactly was copied or provided the Court with a copy of the job shop services brochure, EA represents that the brochure contained detailed drawings of its machines. It is undisputed that the Richermes took many EA CAD drawings and pricing proposals and distributed them to EA's competitors and customers. Photographs of EA products were included in AMPS' brochure and on its website as well.

Similar to the Lanham Act, the Copyright Act provides that EA is "entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). To calculate profits, "the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.* EA has not submitted any proof of actual damages, choosing to focus instead only on Defendants' profits. Its evidence is the same as that for its Lanham Act claims, and thus the Court adopts its analysis of Defendants' profits above. Under that analysis, EA is entitled to $207,257.00 in profits for Defendants' copyright infringement. As initially discussed, this award is not in addition to that for EA's false advertising claim. Rather, the claims merge so as to produce one recovery of $207,257.00 to EA. *See Roulo*, 886 F.2d at 940-41.

## II. Injunctive Relief

EA's request for injunctive relief has evolved since the Complaint was filed. Initially, EA requested that the Court enter an injunction to prevent Defendants from "using any

trademark confusingly similar to any EA trademarks, including without limitation, the Red Trademarked Goods and from making any false or misleading claims in relation to EA, EA's business or EA products."  Doc. 1 at 9–10.  The Complaint also requested that Defendants be required, "pursuant to 15 U.S.C. § 1118, to destroy all materials that contain copies of the false advertising claims and statements."  *Id.* at 10.  Finally, as part of its copyright infringement claim, EA asked for permanent injunctive relief to enjoin Defendants' infringing conduct.  *Id.* at 8.  In its June 6, 2014 updated memorandum of relief, EA continues to request this relief but also asks that Defendants certify the location of EA documents provided to third parties, that Defendants be enjoined from contacting certain EA customers for three years, and that Defendants post a notice on all their documents and websites that AMPS or any other name used by Defendants is not associated with, authorized, or endorsed by EA, cannot offer EA parts, and is not licensed to service EA machines.

Because of the default posture of this case, the Court is limited to considering only the injunctive relief requested in the Complaint.  Rule 54(c) provides that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."  Fed. R. Civ. P. 54(c).  Thus, "the usual rule that a party should be given the relief to which it is entitled whether or not it has requested that relief does not apply" here.  *WMS Gaming, Inc.*, 542 F.3d at 606.  The Court therefore cannot consider EA's belated requests for an injunction prohibiting Defendants from contacting EA customers for three years, for certification of documents provided to third parties, and for notices on Defendants' documents and the AMPS website.[8] But the Court will consider whether the injunctive relief requested in EA's Complaint is appropriate.

---

[8] Similar injunctions are already in place against Defendants in the state court case.  EA's remedy for violations of these orders is in state court, not here.

A.    **Lanham Act Claims**

EA asks the Court to enjoin Defendants from using any of its trademarks and from making false or misleading claims regarding EA, its business, and its products.  The Lanham Act provides the Court with the power to grant injunctive relief "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent" trademark infringement and false advertising violations.  15 U.S.C. § 1116(a).  But an injunction may issue only if (1) EA has suffered irreparable injury, (2) monetary damages are inadequate to remedy the injury, (3) the balance of hardships favors injunctive relief, and (4) issuing the injunction is in the public interest.  *Neuros Co. v. KTurbo, Inc.*, No. 08-cv-5939, 2013 WL 1706368, at *3 (N.D. Ill. Apr. 17, 2013).  Because the Court finds that the second part of the requested relief is already covered by the state court injunctions—and EA has not offered any specifics for why a duplicative injunction is necessary or appropriate—the Court will only consider whether it should enjoin Defendants from using EA trademarks or any confusingly similar marks or imitations thereof. This relief is not squarely addressed by the state court injunctions but instead is appropriately presented here by EA's Lanham Act claims.

As for that requested injunctive relief, the first two elements—irreparable injury and inadequate remedy at law—are met.  "[I]njuries arising from Lanham Act violations are presumed to be irreparable, even if the plaintiff fails to demonstrate a business loss."  *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002); *see also Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741 (7th Cir. 2013) ("[I]rreparable harm is especially likely in a trademark case because of the difficulty of quantifying the likely effect on a brand of a nontrivial period of consumer confusion.").  Additionally, injuries to a plaintiff's goodwill through the defendant's use of a mark "can

constitute irreparable harm for which a plaintiff has no adequate remedy at law." *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997); *Tory Burch LLC v. Partnerships & Unincorporated Ass'ns Identified on Schedule A*, No. 13 C 2059, 2013 WL 1283824, at *8 (N.D. Ill. Mar. 27, 2013) (defendants' actions in passing off goods as plaintiff's would do "damage to [plaintiff's] goodwill, brand confidence, and reputation," damage which could not be remedied monetarily). Wern, EA's president and owner testified about several instances where Defendants provided parts to or repaired machines for EA customers that then required additional attention when those parts or repaired machines malfunctioned. Complaints were made to EA, not to AMPS, requiring EA to undertake damage control measures. This anecdotal evidence underscores the confusion engendered by Defendants' actions in using EA's products, including the Red Trademarked Goods. It also illustrates the damage to EA's goodwill and reputation caused by Defendants and the efforts EA has been forced to undertake to placate its customers. Although Defendants argue that EA has not demonstrated that it lost any market share because Wern testified that EA maintained approximately the same percentage of the market as before Defendants began operating, courts recognize that loss of goodwill is not quantifiable. *See Champion Roofing, Inc. v. Champion Window Mfg. & Supply Co.*, No. 13 C 5478, 2013 WL 6669476, at *5 (N.D. Ill. Dec. 16, 2013). Thus, the fact that EA has not lost market share is irrelevant.

The balance of hardships also favors injunctive relief. EA has made a significant investment in protecting its name and products. Although this investment appears to have been spurred largely by Defendants' actions, EA now has registered a number of trademarks and copyrights. The contemplated injunction would not bar Defendants from conducting all business, but only from using EA trademarks. As Defendants have admitted that the ER Parts

inventory is close to exhausted, this prohibition should not be particularly problematic. Although it also requires them not to produce similar red aftermarket products, such a restriction is in line with the protection to be afforded to EA's trademarks.

Finally, the Court need spend little time discussing whether the injunction is in the public interest, for it is well-established that an injunction intended to prevent consumer confusion serves the public interest. *See Promatek*, 300 F.3d at 813–14; *Champion Roofing, Inc.*, 2013 WL 6669476, at *6. Although "trademark protection should not interfere with the traditional policies of a competitive market," *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998), the injunction will not impede AMPS' ability to compete with EA; instead, it will ensure that EA's trademarks are protected and that customers are not misled about the provider of the goods and services they are receiving. Thus, the Court orders Defendants not to use any current EA trademark, including the Red Trademarked Goods, or any confusingly similar mark or colorable imitation thereof.

EA also requests that the Court order Defendants to destroy all EA materials pursuant to 15 U.S.C. § 1118. Section 1118 provides that the Court may order that all items in Defendants' possession that bear EA's registered marks or that are the subject of EA's false advertising claim be delivered up and destroyed. Defendants testified that they continue to have in their possession EA products that were part of the ER Parts inventory and numerous EA CAD drawings and proposals. Because Defendants have been found liable on EA's Lanham Act claims, the Court orders Defendants to deliver all EA materials in their possession, custody, or control to EA for destruction pursuant to § 1118. *See Hyundai Constr. Equip. U.S.A., Inc. v. Chris Johnson Equip., Inc.*, No. 06 C 3238, 2008 WL 4671749, at *3 (N.D. Ill. Oct. 21, 2008) (requiring defendant to deliver plaintiff's machines to plaintiff or destroy them); *S.C. Johnson & Son, Inc.*

*v. Nutraceutical Corp.*, No. 11-C-861, 2014 WL 4267445, at *19 (E.D. Wis. Aug. 29, 2014) (requiring defendants to deliver all unauthorized products and advertisements to plaintiff for destruction by a date certain).

### B. Copyright Act Claim

EA also requests a permanent injunction "prohibiting Defendants from duplicating, distributing, or displaying any part of EA's copyrighted website or job shop services brochure" pursuant to 17 U.S.C. § 502. Doc. 77 at 16. As under the Lanham Act, the same four-part test applies to determine whether injunctive relief is appropriate. *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012); *Kinsey v. Jambow, Ltd.*, --- F. Supp. 3d ----, 2014 WL 6845930, at *4 (N.D. Ill. Dec. 4, 2014). But EA has not developed its argument as to why it is entitled to injunctive relief under the Copyright Act, failing to address why each factor is satisfied in this situation. The Court is not required to construct EA's argument for it, a task made more difficult here by EA's failure to submit copies of its copyrighted website or job shop services brochure. *See Economy Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008) ("It is not the court's responsibility to research the law and construct the parties' arguments for them."). Accordingly, the Court declines to award EA injunctive relief on its copyright claim. *See Broadcast Music, Inc. v. M.R.T.P., Inc.*, No. 12 C 7339, 2014 WL 2893203, at *7 (N.D. Ill. June 26, 2014) (declining to award permanent injunctive relief pursuant to 17 U.S.C. § 502(a) where plaintiff had not cited relevant Seventh Circuit case law or developed any argument as to why such injunctive relief was appropriate).

### III.    Attorneys' Fees and Costs

#### A.    Entitlement to Attorneys' Fees and Costs

Next, EA seeks an award of attorneys' fees and costs of $827,799.09.  EA contends that it is entitled to attorneys' fees and costs under not only the Lanham Act but also for its state law claims for unfair competition and violation of the UDTPA and ICFA.  There is no dispute that costs are allowed under the Lanham Act.  15 U.S.C. § 1117(a) (providing that plaintiff is entitled to recover "the costs of the action").

An award of attorneys' fees is allowed under 15 U.S.C. § 1117(a) only in "exceptional cases."  *Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, 626 F.3d 958, 960 (7th Cir. 2010).  A case is "exceptional" under the Lanham Act "if the losing party was the defendant and had no defense yet persisted in the trademark infringement or false advertising for which he was being sued, in order to impose costs on his opponent."  *Id.* at 963–64; *see also id.* at 965 ("It should be enough to justify the award if the party seeking it can show that his opponent's claim or defense was objectively unreasonable—was a claim or defense that a rational litigant would pursue only because it would impose disproportionate costs on his opponent—in other words only because it was extortionate in character if not necessarily in provable intention.").  An award of attorneys' fees is also appropriate if the violation is "especially egregious," *Neuros Co. v. KTurbo, Inc.*, 698 F.3d 514, 521 (7th Cir. 2012)—that is, if it is found to be "malicious, fraudulent, deliberate, or willful," *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1099 (7th Cir. 1994).

The Court finds that attorneys' fees are warranted under § 1117(a).  The evidence demonstrates that Defendants have continued to violate the Lanham Act—supplying EA parts, representing that they can service EA machines, and seeking workarounds to use their

knowledge and the EA documents in their possession to obtain business from EA's customers—despite the existence of this case, the entry of default, and the certain entry of judgment against them. *See Neuros Co.*, 698 F.3d at 521 (noting that defendant's persistence in denying that representations were false even after lawsuit was filed weighed in favor of awarding attorneys' fees under § 1117(a)). Some of Defendants' representations were made even after the state court issued injunctions prohibiting them from contacting EA customers. Indeed, the Son represented falsely in at least one instance that no such orders existed. Additionally, the Complaint's allegations of willfulness further support an attorneys' fee award. *See Am. Taxi Dispatch, Inc. v. Am. Metro Taxi & Limo Co.*, 582 F. Supp. 2d 999, 1008 (N.D. Ill. 2008) (awarding attorneys' fees after default judgment, finding allegations of willfulness supported finding that case was an "exceptional" one for § 1117(a) purposes). Thus, the Court will proceed to determine whether EA's request for attorneys' fees and costs is reasonable.[9]

### B.     Reasonableness of Attorneys' Fees and Costs

#### 1.     Attorneys' Fees

Having determined that EA is entitled to attorneys' fees and costs, the Court must consider whether the amounts requested—$788,147.00 in attorneys' fees and $39,652.09 in costs—are reasonable. To do so, the Court will apply the general rules for awarding attorneys' fees under fee-shifting statutes, beginning by calculating the lodestar amount. *See, e.g.*, *Zeltiq Aesthetics, Inc. v. Brown Health Relaxation Station LLC*, No. 13-C-575, 2014 WL 1818154, at *5 (E.D. Wis. May 6, 2014). The lodestar is calculated by multiplying an attorney's reasonable hourly rate by a reasonable number of hours expended. *Johnson v. GDF, Inc.*, 668 F.3d 927, 929–30 (7th Cir. 2012). The Court may then adjust the fees awarded depending on a variety of

---

[9] Because the Court finds that attorneys' fees are appropriate under the Lanham Act, it need not address EA's other alleged bases for attorneys' fees.

factors, including the degree of success, the relationship between the lodestar amount and the damages awarded, awards in similar cases, and the novelty and difficulty of the issues. *Hensley v. Eckerhart*, 461 U.S. 424, 430 n.3, 434, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983); *Gastineau v. Wright*, 592 F.3d 747, 748 (7th Cir. 2010). The Court has discretion in its award of attorneys' fees, as "determining what qualifies as a 'reasonable' use of a lawyer's time is a highly contextual and fact-specific enterprise." *Sottoriva v. Claps*, 617 F.3d 971, 975 (7th Cir. 2010). Hours that are "excessive, redundant, or otherwise unnecessary" should be excluded. *Hensley*, 461 U.S. at 434.

EA submitted sixty-seven pages of billing records from its counsel. The Court has engaged in a line-by-line review to determine whether counsel's time was reasonably expended for *this* litigation and not on other tasks. That review has revealed that certain time must be excluded, such as that where counsel spent time working on the state case or the Father's bankruptcy filing. *See, e.g.*, Doc. 112-2 at 5 (October 3, 2013 entry concerning, among other things, TRO filing in state court); *id.* at 7 (October 28, 2013 entries mentioning state court TRO, federal and state strategies regarding discovery issues, and state court motion to compel); *id.* at 14 (February 12, 2014 entries "regarding status of state claims"); *id.* at 48 (October 17 and 18, 2014 entries related to research on bankruptcy issues). The Court also excludes time spent on the prosecution of the trademarks and copyrights that EA has sued on in this case, as that is preliminary groundwork not chargeable to Defendants. *See, e.g.*, *id.* at 5 (September 19, 24, and 25, 2013 and October 2, 3, and 4, 2013 entries discussing color trademark and copyright filings); *id.* at 7 (October 24, 2013 entry for correspondence with Copyright Office and filing of trademark application); *id.* at 20 (March 7, 2014 entry for meeting regarding submission to USPTO). Finally, time entries that appear unconnected to this case, such as entries concerning a

potential fraudulent unemployment insurance claim and identity theft and entries concerning

other companies that obtained EA proprietary information, cannot be shifted to Defendants under

the lodestar calculation.  *See, e.g.*, *id.* at 51 (July 2 and 7, 2014 entries regarding Remtex and

proprietary information); *id.* at 57 (August 11, 12, and 14, 2014 entries related to potential fraud

and identity theft issues); *id.* at 59 (August 18, 2014 entries related to confidential information

and social security numbers in Defendants' possession).  And because EA's counsel block billed

its time—making it difficult for the Court to separate out any time that may have been devoted to

this case when billed as part of the same entry as excludable time—the Court excludes the

entirety of time contained in those entries containing both compensable and non-compensable

work.  *See Moore v. Madigan*, No. 11-03134, 2014 WL 6660387, at *11 (C.D. Ill. Nov. 24,

2014) (applying "across-the-board reductions where the total number of hours attributable to

compensable work is uncertain"); *Bretford Mfg., Inc. v. Smith System Mfg. Co.*, 421 F. Supp. 2d

1117, 1119 (N.D. Ill. 2006) ("[W]hen the time records do not describe tasks with particularity,

and do not reveal the amount of time claimed to have been spent on each particular task, the

judge is in no position to make a reasonable estimate of the amount of time that should have been

required.  This is the problem with 'block billing,' where the attorney simply lists a string of

tasks performed on a particular day and the total time spent on them, without indicating how

much time was spent on each of the tasks.  Time records prepared in that manner clearly do not

satisfy the documentation requirements of *Hensley*.").

      The Court also excludes time billed for non-compensable administrative tasks, such as

"preparing document[s], assembling filings, electronically filing documents, docketing or

'logging' case events into an internal case tracking system, and telephoning court reporters."

*Delgado v. Vill. of Rosemont*, No. 03 C 7050, 2006 WL 3147695, at *2 (N.D. Ill. Oct. 31, 2006);

*United Cent. Bank v. Kanan Fashions, Inc.*, No. 10 CV 331, 2012 WL 1409245, at *4 (N.D. Ill. Apr. 23, 2012) (disallowing time spent by paralegal and attorneys on clerical tasks). This includes, for example, paralegal and attorney time "preparing complaint and supporting documentation for filing" and "[f]iling same via ND Ill ECF system." *See, e.g.*, Doc. 112-2 at 6 (October 11, 2013 entry for Christopher Froemel); *id.* at 8 (October 1, 2013 entry for opening general file in system and entering due dates in calendar); *id.* at 18 (February 26, 2014 entry for scheduling videographer and court reporter).

Thus, having reviewed the billing records line-by-line and making deductions as stated above, the Court reduces the fee request by $164,379.50, broken down by timekeeper as follows:

Christine Clifford: $138 (.6 hours x $230)

Christopher Froemel: $7,919 ((10.5 hours x $210.00) + (8.5 hours x $240.00) + (16.7 hours x $220.00))

Denise Lazar: $690 (1.5 hours x $460.00)

Joan Long: $106,210 ((49.3 hours x $525.00) + (42.5 hours x $605.00) + (99.3 hours x $550.00))

Timothy McFadden: $9,875 (25 hours x $395.00)

Anne McGuire: $259 (1.4 hours x $185.00)

Valerie Mullican: $3,145 (8.5 hours x $370.00)

Kathleen Murphy: $338 (1.3 hours x $260.00)

Elizabeth Peters: $268 (0.8 hours x $335.00)

Grant Peters: $30,934 ((1 hour x $585.00) + (14.8 hours x $605.00) + (38.9 hours x $550.00))

Zack Whittington: $24 (.2 hours x $120.00)

Monica Wickering: $4,579.50 (21.3 hours x $215.00)

Subtracting this from EA's requested amount results in a lodestar of $623,767.50.

This does not end the inquiry, however, for the Court may further adjust the lodestar based on such factors as the degree of success, the relationship between the fees incurred and the damages awarded, awards in similar cases, and the novelty and difficulty of the case. *Hensley*, 461 U.S. at 430 n.3. Such adjustment is appropriate here, where the requested fees are excessive considering the default posture of the case. Although the Court recognizes that the parties engaged in extensive discovery to determine EA's damages, having reviewed EA's billing records, the Court finds that EA nonetheless overlitigated all phases of the case considering its adversaries and the potential recovery. *See Montanez v. Simon*, 755 F.3d 547, 557 (7th Cir. 2014) (judge has discretion to determine "whether the plaintiff's lawyers would have spent substantially less time on the case had they been more realistic"). EA approached the litigation in an extremely contentious manner at every turn[10]—even putting up great resistance to the withdrawal of Defendants' prior counsel, for which EA's billing records include over fifty-five entries amounting to over $50,000 in fees. Because EA's counsel was not realistic in the manner in which it litigated this case, spending more time on it than warranted, the Court finds it appropriate to reduce the lodestar amount by 20%. *See, e.g.*, *ADT Sec. Servs., Inc. v. Lisle Woodridge Fire Prot. Dist.*, --- F. Supp. 3d ----, 2015 WL 688233, at *10 (N.D. Ill. Feb. 17, 2015) (reducing attorneys' fee award by 10% to reflect "the overly contentious manner in which some aspects of this case were litigated"). This results in an award of $499,014.

## 2.     Costs

The Lanham Act does not define what costs are recoverable and so courts generally look to 28 U.S.C. § 1920 to determine recoverable costs while retaining the discretion to allow recovery for other costs as well. *See Zeltiq Aesthetics, Inc.*, 2014 WL 1818154, at *5; *Medline*

---

[10] The Court acknowledges that Defendants are also to blame for the contentious manner in which discovery proceeded.

*Indus. v. Medline Prods. Co.*, No. 03 C 7255, 2004 WL 1921020, at *5 (N.D. Ill. July 8, 2004).
EA's billing records include various costs it incurred in litigating this matter, such as those for
photocopying, computerized legal research, electronic filing, messenger services, transcripts,
telephone charges, e-discovery charges, meals, and parking.

First, EA seeks recovery of certain filing and process server fees. The $400 filing fee for
initiating this action is recoverable, as it is specifically provided for by § 1920(1). But EA also
seeks to recover the filing fee it paid the bankruptcy court for its motion for relief from the
automatic stay in the Father's bankruptcy case. This $176 charge is not recoverable, as it is not a
filing fee for this action. Service and subpoena fees are also recoverable pursuant to § 1920(1).
From a review of a docket, the Court can determine that the charge for service of summons on
October 22, 2013 was for serving the Complaint on Defendants. *See* Doc. 6-1 (affidavit of
process server regarding service of Complaint on Defendants). EA seeks $227.50 for the process
server's time but the Court will limit EA so that its recovery does not exceed the marshal's fees
of $55 per hour. *Huerta v. Vill. of Carol Stream*, No. 09 C 1492, 2013 WL 427140, at *3 (N.D.
Ill. Feb. 4, 2013). Because the Court does not know how long service took but does know that
three summonses were served, the Court will allow EA to recover $165 for service of the
Complaint. *See Bennett v. Unitek Global Servs., LLC*, No. 10 C 4968, 2014 WL 1322711, at *4
(N.D. Ill. Apr. 2, 2014) (allowing recovery of one hour for each subpoena served). EA also asks
the Court to award it $172 for service of summons or a subpoena on April 14, 2014. This
appears to have been for service on Defendants' insurance carrier, *see* Doc. 57-1 at 29–32, and
so again the Court will allow EA to recover $55 for this expense, equaling one hour of time.

Next, EA seeks recovery for $611.10 in copying charges. Although EA does not provide
any documentation aside from the description "copying charges" and the date of the charge to

justify its request, the Seventh Circuit has recently stated that it would be "preposterous" to require a party to justify copying costs on a document-by-document basis, for "[h]aving a lawyer devote the time necessary to demonstrate the necessity of each transcript and every copy of a document would be far more costly than the copying itself." *Nat'l Org. for Women, Inc. v. Scheidler*, 750 F.3d 696, 698 (7th Cir. 2014); *see also In re Text Messaging Antitrust Litig.*, No. 08 C 7082, 2014 WL 4343286, at *2 (N.D. Ill. Sept. 2, 2014) (following *Scheidler* in concluding that "[i]t would undoubtedly be onerous for any prevailing party in a litigation as long-running and far-reaching as this one to identify precisely each document it had copied along the way, as well as how many there were and how many each copy cost"). Nonetheless, in order to recover for these costs, EA must make some showing that the copies were "reasonably and prudently obtained," *Scheidler*, 750 F.3d at 699; 28 U.S.C. § 1920(4) (allowing recovery for "exemplification and copies of papers necessarily obtained for use in the case"), which EA has not done. The affidavit EA's counsel submitted in connection with its fee petition does not aver that the copies were necessarily obtained for use in this particular case, as opposed to, for example, for use in obtaining the trademark or copyright registrations or in connection with the state court or bankruptcy cases. *Cf. Simstad v. Scheub*, No. 2:07-CV-407-JVB, 2015 WL 880612, at *4 (N.D. Ind. Mar. 2, 2015) (awarding copying costs where attorney affidavit "certif[ied] that the copying fees were correct, necessarily incurred, and attached a series of bills and invoices for the copies"). Because the Court cannot conclude that these charges were reasonably necessary, even under *Scheidler*'s more liberal standard, the copying costs are disallowed.

Third, EA seeks recovery for computerized legal research and PACER system charges. The Seventh Circuit has recognized that these costs are recoverable as part of the attorneys' fee

award.  *See Tchemkou v. Mukasey*, 517 F.3d 506, 513 (7th Cir. 2008) ("[C]osts of computerized

legal research are recoverable as part of an attorney-fee award."); *Haroco, Inc. v. Am. Nat'l Bank*

*& Trust Co. of Chicago*, 38 F.3d 1429, 1440–41 (7th Cir. 1994) (allowing recovery for attorneys'

fees where the "added cost of computerized research is normally matched with a corresponding

reduction in the amount of time an attorney must spend researching").  EA must, however,

provide "information from which the court may determine whether the computerized legal

research charges were reasonably incurred." *Williams v. Z.D. Masonry Corp.*, No. 07 C 6207,

2009 WL 383614, at *5 (N.D. Ill. Feb. 17, 2009).  This EA has not done, offering no evidence to

allow the Court to determine whether the legal research charges are reasonable.  *See Harris N.A.*

*v. Acadia Invs. L.C.*, No. 09 C 6661, 2012 WL 1681985, at *8 (N.D. Ill. May 14, 2012)

(disallowing electronic legal research costs where plaintiff did not provide information regarding

what attorneys charged for research or the nature and subject of the research); *Davis v. Budz*, No.

99 C 3009, 2011 WL 1303477, at *8 (N.D. Ill. Mar. 31, 2011) (disallowing recovery where "[a]ll

that Plaintiff here has offered is a list of dates on which legal research was purportedly

performed and the dates on which WESTLAW billed for the service.").  Thus, the Court declines

to award EA the costs of its Westlaw research, $1,588.04.  But because courts have allowed

recovery of PACER costs as part of an attorneys' fees award, and the Court finds these to be

reasonable, the Court adds the $74.80 in PACER costs to EA's attorneys' fees award.  *See*

*Gutierrez v. P.A.L., Ltd.*, 2012 WL 2993896, at *5 (N.D. Ill. July 20, 2012) (collecting cases).

EA also seeks recovery for numerous general expenses, including courier service,

conference call charges, meals, and parking.  These costs are generally not recoverable under

§ 1920 but rather are considered business overhead.  *See id.*; *Am. Safety Cas. Ins. Co. v. City of*

*Waukegan*, No. 07 C 1990, 2011 WL 6437535, at *11 (N.D. Ill. Dec. 20, 2011).  Overtime meals

and parking may be recoverable, but EA has not provided any explanation as to why they were required in this case. *See Davis*, 2011 WL 1303477, at *9 (disallowing costs for meals and parking because plaintiff had not made "a reasonable showing of the particularized need for the expense at issue"). Thus, none of these general expenses are recoverable.

As for costs for deposition transcripts, while these are recoverable under 28 U.S.C. § 1920(2), EA has not provided the Court with the ability to determine whether the depositions were necessarily obtained for use in this case nor whether the amounts requested were charged at the allowable rate. *See Penn. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, --- F. Supp. 3d ----, 2014 WL 7205584, at *11 (N.D. Ill. Dec. 17, 2014) (disallowing recovery for transcripts where counsel had not provided number of pages copied, which was necessary to determine if costs exceeded regular copy rate); N.D. Ill. L.R. 54.1(b) ("If in taxing costs the clerk finds that a transcript or deposition was necessarily obtained, the costs of the transcript or deposition shall not exceed the regular copy rate as established by the Judicial Conference of the United States and in effect at the time the transcript or deposition was filed unless some other rate was previously provided for by order of court."). These costs, totaling $16,459.63, are disallowed.

Finally, EA seeks recovery of certain e-discovery costs. Section 1920 does "not expressly provide for the recovery of e-discovery costs, meaning that the only route to recovery of these costs must pass through the strictures of 28 U.S.C. § 1920(4), which allows for the recovery of 'fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case.'" *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 11 CV 2450, 2015 WL 351244, at *5 (N.D. Ill. Jan. 27, 2015). The Seventh Circuit has not defined which electronic discovery costs are recoverable, but this Court will follow those courts that have found compensable the costs "associated with the conversion of [electronically

stored information] into a readable format, such as scanning or otherwise converting a paper version to an electronic version or converting native files to TIFF" but not the "costs related to the 'gathering, preserving, processing, searching, culling and extracting of [electronically stored information].'" *Massuda v. Panda Express, Inc.*, No. 12 CV 9683, 2014 WL 148723, at *6 (N.D. Ill. Jan. 15, 2014) (quoting *Johnson v. Allstate Ins. Co.*, No. 07-CV-0781-SCW, 2012 WL 4936598, at *6 (S.D. Ill. Oct. 16, 2012)). EA requests compensation for several charges associated with e-discovery, including for "OCR & TIFF Conversion," "process[ing] native files through ESI utility to allow for capturing of metadata/indexing of material," "load[ing] into Summation," and "prepar[ing] search filters and sav[ing] shared set to database for review team." Doc. 112-2 at 69–70. Only the first $48.24 charge is properly compensable, as it involves the conversion of documents into a readable format. *See Massuda*, 2014 WL 148723, at *6. Processing Defendants' production so as to allow it to be more easily searchable, loading it into a review platform, and preparing searches for EA's counsel to use in reviewing those documents, however, cannot be compared to making copies and is thus not compensable. *See In re Text Messaging*, 2014 WL 4343286, at *3–4 (denying OCR costs because they "merely make a document readable by a computer"); *Phillips v. WellPoint, Inc.*, No. 3:10-cv-00357-JPG-SCW, 2013 WL 2147560, at *6 (S.D. Ill. May 16, 2013) ("extraction of metadata and document text" is an unrecoverable cost). EA also seeks $14,000 in costs for charges related to a forensic examination of Defendants' computers. The $1,200 charge for running a search of Defendants' computers is not a compensable e-discovery cost. *See Massuda*, 2014 WL 148723, at *6 (costs related to searching electronically stored information not compensable). The remaining charges are also sought as a sanction for Defendants' alleged discovery abuses, which the Court considers below. Because the Court is unable to determine whether a portion of the balance of

$12,800 would also qualify as a "copying cost," as EA has not provided any further details, the Court will not allow EA to recover these costs under § 1920(4).

In sum, the Court awards EA $499,088.40 in attorneys' fees and $668.24 in costs.

## IV. Sanctions

Finally, the Court must address EA's motion for sanctions for Defendants' violations of the discovery rules, filed in connection with its April 28, 2014 motion to compel a forensic examination of Defendants' computers. Doc. 56. Judge Grady granted the motion to compel the forensic examination and continued generally EA's sanctions request. Doc. 65. EA seeks an award of at least the cost of the forensic examination, $12,800, which EA maintains was necessitated by Defendants' evasive and incomplete responses and their failure to produce documents during discovery.

This Court has "broad discretion in supervising discovery, including deciding whether and how to sanction . . . misconduct." *Hunt v. DaVita, Inc.*, 680 F.3d 775, 780 (7th Cir. 2012). The Court may impose discovery sanctions pursuant to Federal Rule of Civil Procedure 37(b)(2) for violation of a court order or under its own "inherent power to impose sanctions for abuse of the judicial system, including the failure to preserve or produce documents." *Northington v. H & M Int'l*, No. 08-CV-6297, 2011 WL 663055, at *12 (N.D. Ill. Jan. 12, 2011). The analysis for imposing sanctions under Rule 37 or the Court's inherent power is "essentially the same." *Id.* (quoting *Danis v. USN Commc'ns, Inc.*, No. 98 C 7482, 2000 WL 1694325, at *30 (N.D. Ill. Oct. 20, 2000)). Sanctions are appropriate if the Court makes a finding of bad faith, willfulness, or fault. *Weitzman v. Maywood, Melrose Park, Broadview School Dist. 89*, No. 13 C 1228, 2014 WL 4269074, at *2 (N.D. Ill. Aug. 29, 2014). In determining if sanctions are appropriate, the Court considers (1) whether Defendants breached their discovery obligations, (2) Defendants'

level of culpability for the breach, and (3) the prejudice that resulted from the breach. *Danis*, 2000 WL 1694325, at \*31.

Here, EA does not contend that Defendants violated court orders. Instead, EA argues that, among other things, Defendants' discovery responses were incomplete, inaccurate, and misleading. For example, EA points out that Defendants failed to disclose that they submitted a claim for insurance coverage for the case, despite being asked directly for that information. This required EA to obtain that information from Defendants' insurer pursuant to a subpoena. The Richermes also testified inconsistently with their sworn interrogatory responses during their depositions, at times disclaiming knowledge or understanding of the interrogatory responses despite the Father having signed them. EA also maintains that Defendants did not produce all the responsive documents they had in their possession, requiring EA to conduct the forensic computer examination for which it seeks to recover its costs.

The Court agrees with EA that Defendants' conduct during the discovery process warrants sanctions. Defendants' actions during the discovery process cannot be said to have been done in good faith. They unnecessarily prolonged this case, necessitating the Court's intervention on several occasions and multiplying the costs involved in the litigation. The Court has reviewed Defendants' discovery responses and excerpts of the Richermes' depositions, in which it is clear that they were not cooperating in the discovery process, providing evasive responses and even disclaiming knowledge of responses that they had certified. Nor did Defendants produce documents on a schedule as requested, requiring the Court to order the forensic examination of Defendants' computers. Shifting the cost of the forensic examination to Defendants is thus appropriate. *See Webb v. CBS Broad., Inc.*, No. 08 C 6241, 2011 WL 1743338, at \*6–8, \*17–18 (N.D. Ill. May 6, 2011) (ordering plaintiffs to pay fees and costs of

computer forensics examination where that examination was ordered because of their failure to comply with discovery obligations, active concealment of defendants' documents, making misleading statements in discovery, and violation of court order closing discovery); *cf. IWOI, LLC v. Monaco Coach Corp.*, No. 07-3453, 2011 WL 2038714, at \*5 (N.D. Ill. May 24, 2011) (shifting half the cost of the forensic computer examination necessitated by defendants' failure to comply with discovery onto defendants, noting that shifting entire cost was not appropriate "given that plaintiff only found one document (however significant) from that effort").

## CONCLUSION

For the foregoing reasons, the Court enters judgment in favor of EA and against Defendants as follows:

> (1) $207,257 in monetary damages;
>
> (2) Defendants and their officers, agents, employees, representatives, successors, and assigns are permanently enjoined from using the following EA trademarks or any confusingly similar mark or colorable imitation thereof: No. 4,490,506; No. 4,490,507; No. 4,504,237; No. 4,600,188; No. 4,600,189; No. 4,600,190; No. 4,600,219;
>
> (3) Defendants are ordered to deliver all products and materials in their possession, custody, or under their control bearing EA trademarks or to EA for destruction no later than April 2, 2015, pursuant to 15 U.S.C. § 1118;
>
> (4) $499,088.80 in attorneys' fees; and
>
> (5) $668.24 in costs.

The Court also grants EA's motion for sanctions [56]. Defendants are ordered to reimburse EA $12,800, the cost of the forensic computer examination. This case is terminated.

Dated: March 18, 2015

SARA L. ELLIS
United States District Judge

33